Filed 6/23/21; Certified for Publication 7/16/21 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| GARY MARTIN et al., | D076956 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2018-00044048-CU-WM-NC) |
| CALIFORNIA COASTAL COMMISSION, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Jacqueline M. Stern, Judge.  Affirmed in part and reversed in part.

FisherBroyles and Paul J. Beard II, for Plaintiffs and Appellants.

Xavier Becerra, Attorney General, Matthew Rodriguez, Acting Attorney General, Daniel A. Olivas, Assistant Attorney General, Jamee J. Patterson and Kimberly R. Gosling, Deputy Attorneys General for Defendant and Appellant.


Gary and Bella Martin appeal from a judgment entered after the trial court granted in part and denied in part their petition for writ of

administrative mandate challenging the imposition of certain special conditions placed on the development of their property—a vacant, oceanfront lot in Encinitas—by the California Coastal Commission (Commission). The Commission also appeals the judgment. The Martins' appeal challenges a condition requiring them to eliminate a basement from their proposed home, while the Commission challenges the trial court's reversal of its condition requiring the Martins to set back their home 79 feet from the bluff edge. Because we agree with this court's recent decision in *Lindstrom v. California Coastal Com.* (2019) 40 Cal.App.5th 73 (*Lindstrom*) interpreting the same provisions of the Encinitas Local Coastal Program (LCP) and Municipal Code at issue here, we reverse the trial court's invalidation of the Commission's setback requirement. We affirm the court's decision to uphold the basement prohibition.

FACTUAL AND PROCEDURAL BACKGROUND

The Martins own an 11,394 square-foot, blufftop vacant lot in Encinitas. 5,400 square feet of the lot sits atop the bluff, with the rest extending west down the bluff's face. They applied to the City of Encinitas (the City) for a Coastal Development Permit (CDP) to build a two-story, 3,110 square-foot house with an additional 969 square-foot basement and 644 square-foot garage. The proposed design set the first story of the home back 40 feet from the 93-foot high bluff edge, and set back the second story cantilevered deck 32 feet. In support of the application, and as required by the LCP and Municipal Code, the Martins submitted geotechnical reports certifying the home satisfied the requirements of the LCP contained in Municipal Code section 30.34.020. The City's third-party geotechnical consultant reviewed those reports and agreed with the analysis.

On April 21, 2016, the City Planning Commission adopted a resolution consolidating two lots owned by the Martins into one and approving the CDP for their home. On May 25, 2016, two Commissioners appealed the City's approval to the Commission.[1] At its meeting on July 13, 2016, the Commission found the appeal raised a "substantial issue on the grounds on which the appeal was filed" and continued the matter to a future hearing. In the subsequent months, the Martins' geotechnical consultant GeoSoils, Inc. (GSI) and the Commission staff exchanged reports about the appropriate setback for the proposed development. The parties also met several times to discuss the project.

At the Commission's August 8, 2018 meeting, Commission staff presented a report recommending approval of the home but with additional conditions on the Martins' development of their property, including that the home be set back 79 feet from the bluff's edge and barring the design from including a basement. After a divided vote, the Commission adopted the staff's recommendation and approved the development with the recommended additional conditions.[2]

The Commission staff's report explained its position that the City's approval was inadequate because it failed to account for the LCP's requirement that new development be set back far enough to provide for a safety factor of 1.5 *at the end* of 75 years. The safety factor is a calculation

[1]    The Coastal Act allows an appeal of the local determination by the Coastal Commission if two or more of the Commissioners agree. (Pub. Resources Code, §§ 30603, 30625, subd. (a).) Here, Vice-Chair of the Commission Bochco and Commissioner Shallenberger appealed the City's decision.

[2]    Three of the eleven commissioners sided with the Martins.

that addresses bluff stability, i.e. the risk of landslides or bluff failure, while the time period of 75 years addresses bluff erosion over time.[3]

The two "special conditions" imposed by the Commission at issue on appeal are special condition 1(a), requiring the 79-foot setback from the bluff edge, and special condition 1(c), the basement prohibition.[4] In determining the 79-foot setback, the Commission relied on the analyses of its staff geologist, Dr. Joseph Street, and its staff engineer, Dr. Lesley Ewing. Drs. Street and Ewing reached their conclusions after considering the reports of GSI, hired by the Martins to evaluate the bluff for purposes of permitting the development. GSI opined that a 40-foot setback complied with the LCP, and certified that the home would be "safe from coastal bluff retreat over its

---

[3]    A scientific paper in the administrative record supporting the Commission staff's report explains the safety factor analysis: "In such an analysis, the forces resisting a potential landslide are first determined. These are essentially the strength of the rocks or soils making up the bluff. Next, the forces driving a potential landslide are determined. These forces are the weight of the rocks as projected along a potential slide surface. The resisting forces are divided by the driving forces to determine the 'factor of safety.' A value below 1.0 is theoretically impossible, as the slope would have failed already. A value of 1.0 indicates that failure is imminent. Factors of safety at increasing values above 1.0 lend increasing confidence in the stability of the slope. The industry-standard for new development is a factor of safety of 1.5, and many local grading ordinances in California and elsewhere (including the County of Los Angeles, and the Cities of Irvine, Malibu, and Saratoga, among others) require that artificial slopes meet this factor of safety."

[4]    In the trial court the Martins also successfully challenged special condition 3(a), which provides that, by accepting the permit, the Martins agree that no bluff or shoreline armoring device will ever be built to protect the new home. They have abandoned this challenge on appeal and thus we agree with the Commission that the trial court's invalidation of special condition 3(a) should be reversed.

75-year design life without the need for shoreline protection." Drs. Street and Ewing also reviewed reports by another consultant hired by the Martins, Dr. Ben Benumof, who likewise endorsed the development with a 40-foot setback.

The Commission's staff arrived at 79 feet by adding the setback required to achieve a 1.5 factor of safety (40 feet) and the anticipated erosion over 75 years (39 feet). As to the 1.5 factor of safety, the Commission agreed with GSI that it was presently located 40 feet back from the bluff edge. As to the erosion rate, the Commission staff also agreed with GSI's historic rate of 0.20 feet per year. The Commission staff, however, disagreed with GSI's estimate of a long-term future rate of erosion of 0.27 feet per year. Drs. Street and Ewing concluded that rate did not "adequately account for the likely acceleration of bluff retreat rates in the future due to sea level rise…."

The Commission staff calculated the future erosion rate to be 0.52 feet per year (39 feet over 75 years). It determined this rate using the SCAPE method, a scientifically supported methodology that incorporates site-specific information and sea level rise estimates.[5] GSI had also used a methodology similar to SCAPE at one point, and had calculated an erosion rate of 0.344 feet per year (which it later revised to 0.27 feet per year). Drs. Street and Ewing concluded GSI's rate was not adequate because GSI had relied on a lower projection of future sea level rise than was supported by the most recent scientific literature.

---

[5] "SCAPE (Soft Cliff and Platform Erosion) is a detailed, process-based numerical model that was developed to simulate the sensitivity of shore profile response, including cliff retreat rates, to changes in sea level over timescales of decades to centuries."

Drs. Street and Ewing concluded that 0.52 feet per year was more accurate based on the State of California's most current sea level rise science and recommendations, as outlined in 2017 and 2018 reports by the State's Ocean Protection Council Science Advisory Team. Using data and suggested risk profiles from those reports, the Commission staff adopted a recommended "medium-high risk aversion scenario" resulting in the 0.52 feet per year rate. Commission staff also noted this rate was generally consistent with the 0.49 feet per year erosion rate used by the Commission for the prior five new blufftop home approvals in Encinitas. The rate also fell within the range of uncertainty projected in CoSMoS, a state-of-the-art modeling tool developed by the U.S. Geological Survey.[6]

The Commission staff report also addressed the impact of the proposed 40-foot setback on the project's compliance with the public access and recreation policies of the Coastal Act. The report explained that, in conjunction with sea level rise, if a shoreline protective device became necessary to protect the structure, the installation of such protection would lead to the loss of beach access. In the Commission staff's view, a 79-foot setback, among the other conditions, was necessary to avoid this impact.

As for the proposed basement, the Commission staff found that the Encinitas bluffs are hazardous and unpredictable, and bluff retreat may

---

[6] The Commission's staff report describes CoSMos: "Coastal Storm Modeling System 3.0 (CoSMoS)" is "a new, state-of-the art tool developed by the United States Geological Survey (USGS) to predict year 2100 cliff positions based on various sea level rise scenarios. CoSMoS integrates eight complex cliff retreat models which take into account not only changes in mean sea level (and the rate of [sea level rise]), the historical bluff retreat rate (which is assumed to capture site-specific factors, such as geology), a range of likely wave climates based on historical variability and global climate models, and the progressive evolution of the shore and cliff profiles over time."

eventually cause the basement to be exposed, even with a 79-foot setback. The Commission staff also found that removing or relocating the basement, if feasible, would significantly alter the bluff and could threaten its stability. The Martins submitted a plan for removing the basement, along with GSI's certification of the plan. The Commission, however, found the removal plan was insufficient because it failed to "provide any detail related to geologic stability risks of removing a basement on an eroding blufftop site, [did] not detail how removal of the basement would impact stability of neighboring structures, and [did] not detail how the basement void could be filled" upon removal. Thus, the Commission concluded the proposed basement was inconsistent with the LCP's requirement that all blufftop structures be removable.

After the Commission's conditional approval, the Martins filed a petition for writ of administrative mandate and complaint for declaratory and injunctive relief challenging special conditions 1(a) (the 79-foot setback), 1(c) (the basement prohibition) and 3(a) (the bluff and shoreline armoring device prohibition). In addition to seeking a writ of mandate reversing the Commission's conditional approval, the Martins also sought a declaration that "the Commission's bluff-edge setback methodology" is unlawful, an injunction to preclude the Commission's future use of the methodology, a declaration that "the Commission's policy of requiring the waiver of future shoreline protection as a condition" of approval is unlawful, and an injunction preventing "the Commission from enforcing or implementing such policy."

After briefing and a hearing, the trial court issued an order finding special condition 1(a) was inconsistent with the LCP and the Commission's imposition of the condition was an abuse of discretion. The court also agreed with the Martins that the imposition of special condition 3(a) was an abuse of

7

the Commission's discretion.  The court rejected the Martins' challenge to special condition 1(c), and denied their requests for injunctive and declaratory relief.  Thereafter, the court entered judgment against the Commission and issued a peremptory writ of administrative mandate directing the Commission to set aside and reconsider its conditional approval. Both parties timely appealed the judgment.

DISCUSSION

I

*Legal Standards*

A

*Statutory Background*

" 'The Coastal Act "was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California. The Legislature found that 'the California coastal zone is a distinct and valuable natural resource of vital and enduring interest to all the people'; that 'the permanent protection of the state's natural and scenic resources is a paramount concern'; that 'it is necessary to protect the ecological balance of the coastal zone' and that 'existing developed uses, and future developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well-being of the people of this state....'  ([Pub. Resources Code,] § 30001, subds. (a) and (d).)" [Citation] The Coastal Act is to be "liberally construed to accomplish its purposes and objectives."  (Pub. Resources Code, § 30009.)' "  (*Lindstrom, supra*, 40 Cal.App.5th at p. 91, quoting *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 793–794 (*Pacific Palisades*).)

" 'The Coastal Act expressly recognizes the need to "rely heavily" on local government "[t]o achieve maximum responsiveness to local conditions,

8

accountability, and public accessibility...." (Pub. Resources Code, § 30004, subd. (a).) As relevant here, it requires local governments to develop [LCPs], comprised of a land use plan and a set of implementing ordinances designed to promote the act's objectives of protecting the coastline and its resources and of maximizing public access.' (*Pacific Palisades, supra*, 55 Cal.4th at p. 794.) 'The Coastal Act provides that a local government must submit its [land use plan] to the [Commission] for certification that the [land use plan] is consistent with the policies and requirements of the Coastal Act. ([Pub. Resources Code,] §§ 30512, 30512.2.) After the Commission certifies a local government's [land use plan], it delegates authority over coastal development permits to the local government. (*Pacific Palisades*, at p. 794, citing [Pub. Resources Code,] §§ 30519, subd. (a), 30600.5, subds. (a), (b), (c).)' " (*Lindstrom, supra*, 40 Cal.App.5th at p. 91.)

"After a local government grants a coastal development permit, certain types of permit decisions may be appealed to the Commission by the applicant, any aggrieved person, or two members of the Coastal Commission (Pub. Resources Code, §§ 30603, 30625, subd. (a)). As relevant here, an appeal to the Commission is authorized for '[d]evelopments approved by the local government between the sea and the first public road paralleling the sea or within 300 feet of the inland extent of any beach or of the mean high tideline of the sea where there is no beach, whichever is the greater distance.' (*Id.*, § 30603, subd. (a)(1).) ' "If the Commission determines that an appeal presents a substantial issue, the permit application is reviewed de novo; in effect, the Commission hears the application as if no local governmental unit was previously involved, deciding for itself whether the proposed project satisfies legal standards and requirements." ' (*McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 920, fn. 3; see also Pub. Resources

9

Code, §§ 30621 [de novo hearing on appeal]; 30625, subd. (b)(2) [substantial issue required].)" (*Lindstrom, supra*, 40 Cal.App.5th at p. 92.)

"The Commission's jurisdiction on appeal, however, is limited. [Citation.]  Specifically, '[t]he grounds for an appeal ... shall be limited to an allegation that the development does not conform to the standards set forth in the certified local coastal program or the public access policies set forth in [the Coastal Act].'  (Pub. Resources Code, § 30603, subd. (b)(1).)  In addition, the Commission's jurisdiction on appeal includes imposing reasonable terms and conditions on the permit, as the Coastal Act provides '[a]ny permit that is ... approved on appeal, ... shall be subject to reasonable terms and conditions in order to ensure that such development or action will be in accordance with the provisions of this division.'  (Pub. Resources Code, § 30607.)" (*Lindstrom, supra*, 40 Cal.App.5th at p. 92.)  Further, " ' "[u]nder the Coastal Act's legislative scheme, ... the [LCPs] and the development permits issued by local agencies pursuant to the Coastal Act are not solely a matter of local law, but embody state policy."  [Citation]  "In fact, a fundamental purpose of the Coastal Act is to ensure that state policies prevail over the concerns of local government." ' " (*Lindstrom,* at p. 92.)

B

*Standard of Review*

"To obtain judicial review of a decision or action of the Commission, any aggrieved person has the right to file a petition for writ of mandate pursuant to section 1094.5 of the Code of Civil Procedure.  (Pub. Resources Code, § 30801.)  ' " 'The inquiry in such a case shall extend to the questions of whether the [Commission] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.' "  [Citation]  An abuse of discretion is established if the

10

Commission failed to proceed in the manner required by law, its order or decision is not supported by the findings, or its findings are not supported by substantial evidence. [Citation.] [¶] The trial court presumes that the agency's decision is supported by substantial evidence, and the party challenging that decision bears the burden of demonstrating the contrary. [Citation] In reviewing the agency's decision, the court examines the whole record and considers all relevant evidence, including that evidence which detracts from its decision. [Citation.] "Although this task involves some weighing to fairly estimate the worth of the evidence, that limited weighing does not constitute independent review where the court substitutes its own findings and inferences for that of the Commission. Rather, it is for the Commission to weigh the preponderance of conflicting evidence, as [the court] may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it." ' " (*Lindstrom, supra*, 40 Cal.App.5th at p. 93.)

" 'On appeal ... our role is identical to that of the trial court.' [Citation] ' " 'Thus, the conclusions of the superior court, and its disposition of the issues in this case, are not conclusive on appeal.' " ' " (*Lindstrom, supra*, 40 Cal.App.5th at p. 93.)

C

*Lindstrom v. Commission*

In September 2019 this court issued its opinion in *Lindstrom*, a case presenting issues that overlap with those presented in this case, and which explicitly resolved the same setback question presented here in favor of the Commission. Like this case, *Lindstrom* involved the development of a home on a coastal bluff in Encinitas. (*Lindstrom, supra*, 40 Cal.App.5th at p. 82.) Like the Martins, the Lindstroms obtained a CDP from the City, which was

11

then challenged by the Commission. Unlike this case, the City's approval was based on a geotechnical report prepared by the applicants' consultant, Geotechnical Exploration, Inc. (GEI), which used the *same* methodology advocated for by the Commission (i.e. combining the expected erosion over 75 years with the setback needed to achieve a bluff stability safety factor of 1.5). (*Lindstrom,* at pp. 83–84.) The setback recommended by GEI and approved by the City, however, was based on an erosion rate of 0.125 feet per year, which was far lower than the rate of 0.49 used by GEI for other recent development projects it had been engaged for that were located on "other portions of the Encinitas coast." (*Id*. at p. 84, fn. 3.) As here, the Commission appealed the City's approval of a 40-foot setback. (*Id*. at pp. 84–85.)

Thereafter, GEI submitted a revised report to the Commission that "concluded that the erosion rate of 0.125 per year was in error" and "set forth a revised erosion rate of 0.40 per year, for total erosion of 30 feet in 75 years." (*Lindstrom, supra*, 40 Cal.App.5th at p. 85.) GEI also revised its bluff stability analysis, concluding a safety factor of 1.5 would be achieved at a setback of 42.25 feet, not the 18.3 feet it originally calculated. (*Ibid*.) "GEI explained that if it combined the expected erosion of 30 feet over 75 years with the 42.25 foot setback required to achieve a safety factor of 1.5, the construction would have to be set back a total of 72.25 feet from the edge of the bluff." (*Ibid*.) To avoid the large setback, GEI's new report advocated for an alternative approach that "did not depend on achieving a safety factor of 1.5" after 75 years and resulted in a lesser setback. (*Ibid*.)

Before the Commission hearing, the Lindstroms engaged a different consultant, TerraCosta Consulting Group (TCG) to prepare a new geotechnical report. (*Lindstrom, supra*, 40 Cal.App.5th at p. 85.) TCG also concluded that the predicted bluff erosion rate was 0.40 feet per year. TCG's

12

bluff stability setback calculation was lower, resulting in a factor of safety of 1.5 at 23–25 feet from the bluff edge. (*Id.* at p. 86.) Like GEI's revised report, TCG argued that adding the two setback calculations was unnecessary, opining that the factor of safety of 1.29 it expected at the end of 75 years if a 40-foot setback was approved would be sufficient to prevent the need for a seawall or other bluff stabilization structure. (*Ibid.*) In support of this position, TCG explained that " 'the Coastal Commission does not typically approve seawalls unless the factor of safety at the structure is less than 1.2 and other instability factors are present.' " (*Ibid.*) Thus, it argued, " '[t]here is no engineering reason that a 75-year-old structure near the end of its useful life would be required to have a factor of safety in excess of 1.29 in order to be considered safe.' " (*Ibid.*)

As in this case, the Commission concluded the 40-foot setback advocated for by TCG was insufficient under the LCP because it failed to consider both the factor of safety (i.e. the bluff's stability) and the predicted erosion rate of the coastline. In the proceedings before the Commission, staff geologist Dr. Mark Johnsson explained the LCP required the applicant to demonstrate that the factor of safety of 1.5 be maintained for the full 75 years, not just under present conditions. (*Lindstrom, supra*, 40 Cal.App.5th at p. 87.) Thus, to assure " 'an adequate factor of safety for the expected life of the development,' it was necessary to calculate the total setback as 'equal to the sum of the bluff retreat setback and the slope stability setbacks.' " (*Ibid.*)

Adopting this interpretation of the LCP, the Commission imposed a special condition requiring a 60–62 foot setback from the bluff edge (based on TCG's calculations), which it found would allow the owners to construct a 3,500 square foot home (or larger if a variance of the front setback

13

requirement was obtained).  (*Lindstrom, supra*, 40 Cal.App.5th at pp. 87–88.) The Lindstroms challenged the decision and, as in this case, the trial court concluded the Commission's interpretation of the LCP was wrong.  The court relied on correspondence, which the Martins also heavily rely on, written by a city planner in 2006 concerning coastal development.  In the letter, the planner states that the City required applicants to provide a geotechnical report that calculated erosion over 75 years and the present 1.5. factor of safety, and to impose a setback requirement equal to the larger of the two calculations, but did not require the setbacks to be combined.  (*Id*. at p. 90.)

The Commission appealed and this court rejected the trial court's interpretation of the LCP.  We held the LCP, as implemented by Encinitas Municipal Code section 30.34.020, explicitly " 'requires a structure to 'be reasonably safe from failure *and* erosion over its lifetime.' (Encinitas Mun. Code, § 30.34.020D, italics added.)  Further, [we held] the LCP specifically provides that the geotechnical report must '[d]emonstrate a safety factor against slope failure of 1.5' and must '[a]ddress a time period of analysis of 75 years.' (Encinitas Mun. Code, § 30.34.020D.11, 2d par. b & c.)" (*Lindstrom, supra*, 40 Cal.App.5th at p. 98.)  We concluded that, "[w]hen read together, the plain meaning of these provisions is that, taking into account the erosion that will occur over 75 years, the geotechnical report must demonstrate a safety factor of 1.5 *at the end of 75 years*." (*Ibid.*, italics added.)

*Lindstrom* concluded the interpretation of the LCP advanced by the Martins, "in which a safety factor of 1.5 must be shown only *at the present time*, not taking into account predicted erosion over the lifetime of the structure, defies the plain language of the LCP as well as common sense.  A layman does not need special geotechnical training to understand the self-evident concept that for a structure to 'be reasonably safe from failure and

14

erosion over its lifetime' (Encinitas Mun. Code, § 30.34.020D), the *combined effect* of expected erosion and bluff instability must be considered. [Footnote omitted.] A structure that is reasonably safe *today* because it is located 40 feet from the edge of the bluff will not be reasonably safe *at the end of its lifetime* when the bluff has eroded 37 feet, meaning that the structure is only three feet from the edge of the bluff." (*Lindstrom, supra*, 40 Cal.App.5th at p. 98.)

## II

### *The Commission Correctly Interpreted the LCP and Encinitas Municipal Code Section 30.34.020D*

As the Commission rightly points out in its briefing, *Lindstrom*, which was issued after the trial court's decision in this case, definitively rejected the argument advanced by the Martins that the Commission wrongly interpreted the LCP in its calculation of the required setback. The Commission asks this court to follow *Lindstrom* and again uphold its interpretation of the LCP. The Martins ask us to reconsider *Lindstrom* and argue "the methodology used to arrive at [the 79-foot] setback contravenes the LCP as interpreted by the City for a quarter century."

### A

The Commission certified the City's LCP in 1995. The LCP is comprised of a Land Use Plan, which states the City's general goals and policies, as well as Zoning Regulations. The Land Use Plan comprises a number of specific "elements," including Land Use and Public Safety Elements. The City's Zoning Regulations, codified in Title 30 of the Encinitas Municipal Code, implement the goals of the Land Use Plan. (Pub. Resources Code, § 30513.)

15

The LCP imposes specific requirements on the development of blufftop property within the Coastal Bluff Overlay Zone as defined by the City's Land Use Plan. The LCP mandates that, with limited exceptions, no new principal or accessory structure can be constructed "within 40 feet of the top edge of the coastal bluff." (Encinitas Mun. Code, § 30.34.020B.1.) The provision of the LCP at issue here, Encinitas Municipal Code section 30.34.020D, requires applicants seeking a permit or development approval for new construction within the Coastal Bluff Overlay Zone, to submit "a soils report, and either a geotechnical review or geotechnical report" that is "prepared by a certified engineering geologist who has been prequalified as knowledgeable in City standards, coastal engineering and engineering geology." (Encinitas Mun. Code, § 30.34.020D.)

Further, the report must "certify that the development proposed will have no adverse affect [sic] on the stability of the bluff, will not endanger life or property, and that any proposed structure or facility is expected to be reasonably safe from failure and erosion over its lifetime without having to propose any shore or bluff stabilization to protect the structure in the future." (Encinitas Mun. Code, § 30.34.020D.) The ordinance then sets forth a list of specific items the report must address related to the geology of the property. (*Ibid*.) The geotechnical report must also "express a professional opinion as to whether the project can be designed or located so that it will neither be subject to nor contribute to significant geologic instability throughout the life span of the project." (*Ibid*.) Finally, the report must:

> "include identification of the daylight line behind the top of the bluff established by a bluff slope failure plane analysis. This slope failure analysis shall be performed according to geotechnical engineering standards, and shall:
> a. Cover all types of slope failure.

16

b. Demonstrate a safety factor against slope failure of 1.5.

c. Address a time period of analysis of 75 years."

(Encinitas Mun. Code, § 30.34.020D.)

B

The Martins make various arguments in support of their assertion that *Lindstrom* was wrongly decided. First, they contend the plain language of section 30.34.020D does not support the Commission's method of calculating the setback. They argue the ordinance only requires that the "slope failure analysis" prepared by an applicant's certified engineering geologist: (a) " '[c]over all types of slope failure;' " (b) " '[d]emonstrate a safety factor against slope failure of 1.5;' " and (c) " '[a]ddress a time period of analysis of 75 years,' " but that the provision does not require the calculations under (b) and (c) be combined.

Next, the Martins argue that additional language in the ordinance relied on by *Lindstrom* to support its determination that the LCP requires the two setback calculations be combined—"that any proposed structure or facility is expected to *be reasonably safe from failure and erosion over its lifetime*"—also does not require the use of the Commission's methodology. (*Lindstrom, supra*, 40 Cal.App.5th at p. 102.) They argue that because the phrase is not quantified, other methodology can also satisfy the standard. (Encinitas Mun. Code, § 30.34.020D.) Finally, the Martins argue the methodology used by the Commission is overly cautious and inconsistent with "State-established standards of practice…."

We are not persuaded by these arguments. As *Lindstrom* explained, the LCP explicitly requires the structure "be reasonably safe from failure *and* erosion *over its lifetime*." (*Lindstrom, supra*, 40 Cal.App.5th at p. 98, quoting Encinitas Mun. Code, § 30.34.020D, second italics added.) Further, the

17

ordinance requires the geotechnical report to "demonstrate a safety factor against slope failure of 1.5" ("the industry standard for new construction on slopes") and "[a]ddress a time period of analysis of 75 years." (*Ibid*.) "When read together, the plain meaning of these provisions is that, taking into account the erosion that will occur over 75 years, the geotechnical report must demonstrate a safety factor of 1.5 *at the end of 75 years*." (*Ibid*., italics added.) The methodology proposed by the Martins, i.e. using only the greater of the two calculations, does not take "into account predicted erosion over the [full] lifetime of the structure, def[ying] the plain language of the LCP as well as common sense." (*Ibid*.)

With respect to the Martins' assertion that other methodology can satisfy the LCP's requirements, they propose no other method that accounts for both erosion and stability. Rather, they argue only that because "an owner wouldn't even 'qualify' for shoreline protection until a structure's factor of safety fell to 1.2 or below" the Martins' proposed home is reasonably safe over its 75-year lifetime. The standard employed for the construction of shoreline protection, however, is not the same standard the LCP applies to new construction. We agree with our *Lindstrom* colleagues that a "layman does not need special geotechnical training to understand the self-evident concept that for a structure to 'be reasonably safe from failure and erosion over its lifetime' (Encinitas Mun. Code, § 30.34.020D), the *combined effect* of expected erosion and bluff instability must be considered." (*Lindstrom, supra*, 40 Cal.App.5th at p. 98.) "A structure that is reasonably safe *today* because it is located 40 feet from the edge of the bluff will not be reasonably safe *at the end of its lifetime* when the bluff has eroded [39] feet, meaning that the structure is only [one foot] from the edge of the bluff." (*Ibid*.)

18

For this reason, we also reject the Martins' contention that the methodology employed by the Commission is an " 'unrealistically conservative' redundancy." The methodology the Commission employs is the one required by the LCP; thus, whether the "American Society of Civil Engineers, Los Angeles Section" outlines a different requirement, as the Martins contend, is not controlling.[7] As this court held previously, "the City's LCP *expressly states* that the geotechnical report must '[d]emonstrate a safety factor against slope failure of 1.5' " at the "end of 75 years." (*Lindstrom, supra*, 40 Cal.App.5th at p. 99.)

The Martins also argue that *Lindstrom* should not control because it wrongly assumed there was no "interpretive disagreement … between the City and the Commission concerning the LCP's setback provisions." The Martins base this assertion on the fact that the record in *Lindstrom* did not contain an explicit statement of the City's current interpretation of the ordinance (since the City approved the development based on the Lindstroms' first consultant's analysis which used the additive method), while here the City explicitly accepted the Martins' interpretation. This argument is a red herring. As we held in *Lindstrom*, the existence of an interpretive disagreement between the Commission and City is irrelevant because the plain language of the LCP requires the additive methodology to determine the appropriate setback.[8] (*Lindstrom, supra*, 40 Cal.App.5th at p. 96.)

---

[7]    The Martins' citation to this standard is a letter drafted by their geotechnical consultant that merely states this standard, but they do not provide the source material.

[8]    For this same reason, we need not reach the parties' dispute over which governmental agency's interpretation of the LCP is entitled to greater deference.

The fact that various setbacks have been accepted by the Commission since the adoption of the LCP in 1995 also does not lead to the conclusion that the Commission's interpretation of the ordinance is incorrect. Citing the trial court's order in *Lindstrom* that this court reversed, the Martins assert the "Commission acknowledged it was moving away from the LCP to address the fact that '[w]e are in a new normal' and 'new world.' " The *Lindstrom* order goes on to state that the Commission's staff noted that "[t]here have been circumstances where the Commission has not required development to be set back the sum of the factor of safety and the erosion rate over 75 years." However, it next states that "[m]any of these analyses *did not correctly apply the 1.5 factor of safety* for the life of the new structure according to current Commission practice." (Italics added.) Like the *Lindstrom* panel, we do not agree that because the ordinance may have been applied incorrectly in the

past, the City's incorrect interpretation deserves deference.[9] (*Lindstrom,*
*supra*, 40 Cal.App.5th at pp. 96–98.)

III

*Substantial Evidence Supported the Commission's Imposition*
*of Special Condition 1(a)*

The Martins next contend that even if the methodology used by the
Commission was in accord with the LCP, there was not substantial evidence
to support a 79-foot setback. Specifically, they argue there was no evidence

---

[9]    The Commission staff's report for the final hearing in this case sheds
additional light on historical setback approvals in the area of the Martins'
home. The report acknowledges the Commission did not appeal bluff
approvals from 1995-2000 but explains the reason for inaction was that the
Commission did not have a sufficiently experienced staff to challenge the
approvals. The Commission report states, "it is likely that the geotechnical
claims made by these applicants were inconsistent with the requirements of
the City's LCP and were not based on the cumulative setback needed to
account for 75 years of expected erosion and the 1.5 Factor of Safety." In
2001, the Commission hired its first licensed geologist and since then has
appealed 16 of 23 approvals by the City of new bluff top homes. Of those
challenges, "[t]he interpretation of how to correctly determine the appropriate
bluff edge setback was an appeal contention in … 10 appeals that the
Commission took a final action on (either approval on De Novo or No
Substantial Issue and not withdrawn or still pending). In 9 of the 10 appeals,
the Commission found that the correct way to determine the [setback] is to
find the distance from the bluff edge necessary to achieve a factor of safety of
1.5 today and add to that the expected bluff retreat over the next 75 years."
In contrast, the only evidence the Martins submitted in support of their
claim that smaller setbacks were approved by the Commission are
photographs of the homes adjacent to their lot with no information
concerning when those homes were permitted and, as in *Lindstrom*, "an
unhelpful summary chart prepared by the [Martins] for the Commission
hearing that is not accompanied by any supporting record citations."
(*Lindstrom, supra*, 40 Cal.App.5th at p. 96, fn. 22.)

21

to support the future erosion rate of 0.52 feet assumed by the Commission and that it is mere speculation.  This argument is without merit.

Like the trial court, we presume " 'that the [Commission's] decision is supported by substantial evidence ....' " (*Lindstrom, supra*, 40 Cal.App.5th at p. 93.)  The party challenging the Commission's decision " 'bears the burden of demonstrating the contrary.' " (*Ibid*.)  Although our " ' "task involves some weighing to fairly estimate the worth of the evidence, that limited weighing does not constitute independent review where the court substitutes its own findings and inferences for that of the Commission.  Rather, it is for the Commission to weigh the preponderance of conflicting evidence, as [the court] may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it." ' " (*Ibid*.)

The parties agree that the rate of erosion will increase from the historical level as a result of sea level rise.  The disagreement lies in how much they think the rate may rise.  The Martins also contend the Commission did not factor in the strength of the material at the base of the bluff, material known as Torrey sandstone, and instead incorrectly assumed it was made of softer material more susceptible to erosion.  According to the Martins, these errors resulted in erosion projections that are too conservative, and thus show the imposition of the 79-foot setback is not supported by substantial evidence.  The administrative record, however, establishes the Commission's staff used well-accepted scientific methodology to support its setback recommendation to the Commission, including with respect to projected erosion.

22

As discussed, Drs. Street and Ewing arrived at the erosion rate of 0.52 feet per year using the SCAPE methodology.[10] The Commission provided ample explanation for Drs. Street and Ewing's conclusion that a higher projected level of rise was more appropriate than that advocated for by the Martins' geotechnical consultant, GSI. Critically, the Commission staff used more recent sea level rise data and recommendations than those used by GSI.[11]

Specifically, the staff relied on two recent reports, which it asserts constitute the "best available science on which to base future planning and investing decisions in California" and which GSI acknowledged provided current sea level rise estimates. The more recent of the two reports used by the Commission staff, titled *State of California Sea-Level Rise Guidance 2018 Update*, expands on the other, earlier report by providing a framework for municipalities and other governance bodies to determine the appropriate sea level rise projections for various types of planning and policy decision making based on the level of risk aversion that applies to the decision. For types of development where the consequences of incorrect projections of sea level rise are greater, the report guides the decision maker to use more conservative projections.

---

[10] The Martins also attempt to discredit Drs. Street and Ewing because they are not "certified" engineering geologists. As the Commission points out, however, it is not required to have a certified engineering geologist on staff. The record shows both professionals are qualified to evaluate the submissions of the applicants and opine on the issues before this court. (See *Lindstrom, supra*, 40 Cal.App.5th at p. 99, fn. 25.)

[11] Even GSI proposed using a similar methodology to SCAPE but assumed a lesser rate of sea level rise.

Applying the framework to this project, Drs. Street and Ewing concluded that 0.52 feet per year was an appropriate projection of future erosion. Drs. Street and Ewing then performed two checks on their conclusions, first using another scientifically accepted methodology, CoSMoS, and second by comparing the erosion rate to that used in the Commission's five most recent approvals of new homes on the Encinitas blufftop. Both confirmed the projection.

With respect to the relative strength of the material underlying the bluff, the Commission responded to GSI's criticisms, explaining that the strength was accounted for in multiple ways, including using the site-specific historical erosion rate as the starting point for its SCAPE calculations and cross-checking the SCAPE calculations against CoSMos, which uses cliff-retreat projections for two 100-meter stretches of coast near the Martins' site. In addition, the Commission staff explained that, contrary to the Martins' assertions, it *did* examine the geological specifics of the Martins' site, agreeing that "the material strength of a bluff is absolutely crucial in determining the erosion rate," but found it more appropriate to use a broader view of the surrounding coastline than GSI.

Given these facts, the record contains ample support for the Commission's use of the 0.52 feet per year rate of erosion. The Martins have not established that the Commission failed to adequately account for the strength of the material at the bottom of the bluff, or that this factor invalidates the Commission staff's approach. At most, the Martins have shown disagreement between experts about the potential erosion in the area. It was the Commission's role to evaluate this competing evidence, and it is not our role to reevaluate the Commission's reasoned decision. (See *Kirkorowicz v. California Coastal Com.* (2000) 83 Cal.App.4th 980, 986

(*Kirkorowicz*) ["it is for the Commission to weigh the preponderance of conflicting evidence, as we may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it"].)  Accordingly, we reject the Martins' contention that insufficient evidence supports the Commission's imposition of special condition 1(a).

IV

*The LCP Requires All New Construction Be Designed and Constructed for Future Removal*

The Martins next contend that special condition 1(c), which prohibits the Martins from constructing a basement, was improperly imposed.  They contend the LCP policy under which the condition was authorized applies only to construction that is within 40 feet of the bluff's edge and therefore does not apply to their proposed development at all.  The Commission responds that the trial court's interpretation of the policy language to apply to all new construction was correct.  We agree with the Commission.

Policy 1.6 of the City's LCP sets forth a list of specific actions the City must undertake to "provide for the reduction of unnatural causes of bluff erosion.…"  Included within that list is subdivision (f), which states in full:

> "Requiring new structures and improvements to existing structures to be setback 25 feet from the inland blufftop edge, and 40 feet from coastal blufftop edge with exceptions to allow a minimum coastal blufftop setback of no less than 25 feet.  For all development proposed on coastal blufftops, a site-specific geotechnical report shall be required.  The report shall indicate that the coastal blufftop setback will not result in risk of foundation damage resulting from bluff erosion or retreat to the principal structure within its economic life and with other engineering evidence to justify the coastal blufftop setback.
>
> "On coastal bluffs, exceptions to allow a minimum setback of no less than 25 feet shall be limited to additions or expansions to

25

existing principal structures which are already located seaward of the 40 foot coastal bluff top setback, provided the proposed addition or expansion is located no further seaward than the existing principal structure, is set back a minimum of 25 feet from the coastal blufftop edge, and the applicant agrees to remove the proposed addition or expansion, either in part or entirely, should it become threatened in the future.

*"In all cases, all new construction shall be specifically designed and constructed such that it could be removed in the event of endangerment and the applicant shall agree to participate in any comprehensive plan adopted by the City to address coastal bluff recession and shoreline erosion problems in the City.*

"This does not apply to minor structures that do not require a building permit, except that no structures, including walkways, patios, patio covers, cabanas, windscreens, sundecks, lighting standards, walls, temporary accessory buildings not exceeding 200 square feet in area, and similar structures shall be allowed within five feet from the bluff top edge …."  (Italics added.)

The Martins argue that the italicized portion of the provision, the third paragraph, applies only to the immediately preceding paragraph and thus only to construction that is exempted from the 40 foot setback requirement. The Martins reason that this interpretation is "consistent with the overall policy of protecting only realistically vulnerable structures at or near the bluff edge."

" 'The construction of an ordinance is a pure question of law for the court, and the rules applying to construction of statutes apply equally to ordinances.' " (*Lindstrom, supra*, 40 Cal.App.5th at p. 94.)  "We give the language its usual and ordinary meaning, and '[i]f there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs.' " (*Allen v. Sully-Miller Contracting Co.* (2002) 28 Cal.4th 222, 227.)  We agree with the Commission that the Martins'

interpretation of Policy 1.6.(f) conflicts with the provision's plain language, which states explicitly it applies "in all cases."

As the Commission contends, the paragraph at issue stands alone, after one paragraph setting forth the general setback rules for new structures and improvements, and a second paragraph containing the exception for additions and expansions of existing structures. This structure, addressing distinct issues in each paragraph, in conjunction with the policy's use of the phrases "[i]n all cases" and "all new construction," makes clear that the third paragraph applies to both preceding paragraphs, not just the second and immediately preceding paragraph. (See *People v. Cole* (2006) 38 Cal.4th 964, 975 ["We must harmonize the various parts of the enactments by considering them in the context of the statutory framework as a whole."].) Accordingly, we reject the Martins' contention that special condition 1(c) was not authorized because the removability requirement it applied to the proposed basement is only applicable to construction *within* 40 feet of the bluff edge.

The Martins also cite Encinitas Municipal Code Section 30.34.020B.1, in support of their position. They state the provision mirrors Policy 1.6(f) and thus requires the same interpretation. We disagree. Subdivision B.1 of section 30.34.020 restates the prohibition on the construction of structures less than 40 feet from the top edge of the bluff. It then lists four exceptions to the prohibition. The first, found in subdivision B.1.a, on which the Martins rely, states:

> "Principal and accessory structures closer than 40 feet but not closer than 25 feet from the top edge of the coastal bluff, as reviewed and approved pursuant to subsection C, Development Processing and Approval, of this section. This exception to allow a minimum setback of no less than 25 feet shall be limited to additions or expansions to existing principal structures which are already located seaward of the 40-foot coastal blufftop setback, provided the proposed addition or expansion is located no further

27

seaward than the existing principal structure, is setback a minimum of 25 feet from the coastal blufftop edge and the applicant agrees to remove the proposed addition or expansion, either in part or entirely, should it become threatened in the future. *Any new construction shall be specifically designed and constructed such that it could be removed in the event of endangerment and the property owner shall agree to participate in any comprehensive plan adopted by the City to address coastal bluff recession and shoreline erosion problems in the City*." (Italics added.)

As the trial court pointed out, this provision is not applicable to the Martins' proposed development of a new home. Although the italicized language mirrors that found in Policy 1.6(f), unlike 1.6(f) it is plainly addressed only to new construction that falls within the exception at issue, i.e. construction of additions or expansions of existing structures that are seaward of the 40-foot setback line. We fail to see how this ordinance supports the imposition of a limitation on Policy 1.6(f)'s broader requirement that all new construction be designed and constructed for removal.

V

*The Imposition of Special Condition 1(c) Is*

*Supported by Substantial Evidence*

The Martins' final contention on appeal is that insufficient evidence supported the imposition of special condition 1(c) prohibiting them from constructing a basement. Specifically, they assert that there is no evidence in the record to support the Commission's findings that removal of the basement would require alteration of the bluff and that excavation of the basement, if necessary, would threaten the bluff's overall stability. The Martins further contend that the "Demolition and Removal Plan" they submitted establishes that the basement could be removed without disturbing the bluff's stability.

28

The Commission counters that substantial evidence in the administrative record supports this special condition. Specifically, they assert the evidence shows the bluff is both highly susceptible to landslides and "actively eroding." The Commission also asserts that in addition to this existing threat, the increasing sea level rise and the uncertainty of its impact intensifies the risk the basement could be exposed in the future. Additionally, the Commission asserts its staff provided significant evidence that removal of the basement would threaten the overall stability of the bluff and the neighboring structures.

We agree with the Commission that there is sufficient evidence to support the Commission's finding a basement cannot be safely removed, justifying the imposition of special condition 1(c). The Martins, in essence, contend that the only evidence relevant to the determination is the report of GSI who opined there are no "geologic stability risks" associated with the removal of the basement. Their report, however, does not negate the substantial evidence relied on by the Commission.

With respect to the fragility of the bluff, the geotechnical review report prepared by Drs. Street and Ewing explained that "the bluff at the project site is actively eroding, as evidenced by the bluff toe notching, occasional block fall talus, bluff face rilling, and minor upper bluff retreat that is visible in historical aerial photographs (California Coastal Records Project, http://www.californiacoastline.org)." The Commission staff report also cited a 2010 report prepared by GSI stating that "while there is no evidence of historic or ancient deep-seated landslides, the upper terrace materials have a potential for retreat through rotational landslides (GSI 2010)." Additionally, Commission staff reported that "the entire Encinitas coastline has been identified by the California Division of Mines and Geology as an area 'most

29

susceptible' to landslides (Tan and Giffen 1995)," and explained "several significant landslides have occurred in the project vicinity, including a 400-foot wide, deep-seated slide at Beacon's Beach (900 block of Neptune Ave.) that was initiated in 1982-83 (URS 2014), and a large bluff failure (100-ft wide, 10-ft thick) on the 400 block of Neptune Ave. that occurred in 1993 (USACE 1996)." Drs. Street and Ewing also opined that higher levels of erosion than those projected for their setback calculations were possible. This evidence sufficiently supported the Commission's finding that the proposed basement might become endangered.

Likewise, substantial evidence supported the Commission's finding that removal of the basement would threaten the stability of the bluff. In addition to the significant evidence concerning the risk of landslides in the area of the Martins' lot, Dr. Ewing testified that the basement would be "placed into terrace materials, which is mostly somewhat consolidated sand." Dr. Ewing explained that if bluff erosion or recession necessitates the removal of the basement, the nearby sand "is going to be lacking support and … is not going to stay on that vertical face, and so it's going to slump in. [¶] ... [T]hat collapse of the sand [will] come through to the bluff face itself." Dr. Ewing also stated that if the basement is removed, the home above would likely require removal as well, further threatening the bluff's stability.[12]

This testimony and documentation constitutes substantial evidence supporting the Commission's conclusion that removing or relocating the

---

[12] The Surfrider Foundation, a non-profit environmental advocacy group, similarly testified that "[r]emoval of the basement in the future could significantly alter the bluff's natural state, which is also inconsistent with the LCP." The Surfrider Foundation's letter submission advocated elimination of the proposed basement "to make the structure more moveable, if ever threatened by erosion."

basement would alter and potentially destabilize the bluff.  The Martins'
conflicting evidence, consisting of GSI's contrary opinion that the proposed
removal of the basement would not be harmful, does not require reversal.  As
with special condition 1(a), it is not our role to reweigh the evidence in the
manner the Martins advocate or to substitute our view for that of the
commission.  (See *Kirkorowicz, supra*, 83 Cal.App.4th at p. 986; *Pescosolido v.
Smith* (1983) 142 Cal.App.3d 964, 970 ["The burden is upon the appellant to
show there is no substantial evidence whatsoever to support the findings."].)

## DISPOSITION

The judgment is reversed in part as to special conditions 1(a) and (3)(a)
and affirmed in part as to special condition 1(c).  The trial court's writ of
administrative mandate requiring the Commission to set aside and
reconsider its August 8, 2018 decision conditionally approving Coastal
Development Permit No. A-6-ENC-16-0060 is vacated.  The parties to bear
their own costs of appeal.


McCONNELL, P. J.


WE CONCUR:


DATO, J.


DO, J.


31

Filed 7/16/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GARY MARTIN et al., | D076956 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2018-00044048-CU-WM-NC) |
| CALIFORNIA COASTAL COMMISSION, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Appellant. | |

THE COURT:

The opinion in this case filed June 23, 2021 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to:  All parties